UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERLA A.,<br><br>                    Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security Administration,<br><br>                    Defendant. | Case No.:  19cv1802-RBB<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR REVERSAL AND/OR REMAND [ECF NO. 13]** |

On September 18, 2019, Plaintiff Perla A.[1] commenced this action against Defendant Andrew M. Saul, Commissioner of Social Security Administration, for judicial review under 42 U.S.C. § 405(g) of a final adverse decision for supplemental security income benefits [ECF No. 1].  On September 23, 2019, Plaintiff consented to the

---

[1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

jurisdiction of Magistrate Judge Andrew G. Schopler [ECF No. 6].[2]  Defendant filed the Administrative Record on November 19, 2019 [ECF No. 8].  On March 10, 2020, Plaintiff filed a motion for reversal and/or remand [ECF No. 13].  Defendant filed an opposition to Plaintiff's motion on April 14, 2020 [ECF No. 14].  On June 25, 2020, Judge Schopler transferred this matter to Magistrate Judge Ruben B. Brooks [ECF No. 15].  Plaintiff's consent to Judge Brooks's jurisdiction was filed on July 2, 2020 [ECF No. 16].

For the following reasons, Plaintiff's motion for reversal and/or remand is **DENIED**.

## I.     BACKGROUND

Plaintiff was born on May 24, 1996.  (Admin. R. 127, ECF No. 8.)[3]  On January 25, 2016, Perla A. filed an application for supplemental security income benefits under Title XVI of the Social Security Act.  (Id. at 127-36.)  She alleged that she had been disabled since November 17, 2015, due to generalized anxiety disorder, other mental impairment, neck problems, and stomach problems.  (Id. at 127, 191.)  Her application was denied on initial review and again on reconsideration.  (Id. at 74-77, 81-85.)  An administrative hearing was conducted on May 15, 2018, by Administrative Law Judge ("ALJ") Donald P. Cole; on August 23, 2018, he determined that Plaintiff was not disabled.  (Id. at 15-25.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration denied the request for review on July 24, 2019.  (Id. at 1-4.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

---

[2] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in cases of this nature.

[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

A. <u>**Medical Evidence**</u>

On July 28, 2015, Plaintiff, age nineteen, was seen at the emergency room at Sharp Memorial Hospital with complaints of head pain, facial pain, and shortness of breath. (Id. at 221.)  Plaintiff was "quite anxious" and "somewhat difficult to get a history from." (Id.)  Perla A. indicated that she had not felt well for several weeks and had significant anxiety for which she saw a psychiatric provider but did not take any medications.  (Id.)  The emergency room physician did not find evidence of any concerning pathology, deduced that Plaintiff's symptoms were anxiety-related, and advised her to follow up with her psychiatric provider and primary care doctor.  (Id. at 223.)

Plaintiff was seen by San Diego County Mental Health Services at the Union of Pan Asian Communities on August 18, 2015, where she received a mental health assessment from therapist Myrna Knight.  (Id. at 231-48.)  Perla A. reported feeling sad that she was not the same person she was six months prior, when she had been attending school, working, and socializing with friends and family.  (Id. at 232.)  She worried constantly that something bad was going to happen to her and her parents, had no motivation or concentration, felt panicky, and had dropped out of school.  (Id.)  Her symptoms began after she started her first job, at which time her stress level increased and her anxiety became out of control.  (Id.)  Plaintiff denied any suicidal ideation and stated, "I love life."  (Id. at 233.)  Perla A. told the therapist that she had received counseling at school when she was fifteen because she had been disrespectful to her teachers and had difficulty controlling her anger; Perla A. had repeated ninth grade due to her behavioral issues.  (Id. at 233, 234.)

The therapist diagnosed Plaintiff as having an anxiety disorder, not otherwise specified, as evidenced by "persistent worr[y], fearful, anxious, tense, trouble breathing, sweating hands, phobic, panic, feeling of [losing] control, feeling detached, withdrawn, lack of motivation, difficulty concentrating, lack of energy."  (Id. at 247.)  Ms. Knight

noted that Perla A.'s anxiety "interferes with daily performance such as school, job, family interaction, and social events." (Id.) The therapist also provided a secondary diagnosis of psychotic disorder, not otherwise specified, due to Plaintiff's "feelings of depersonalization, paranoia, delusions, feelings of being watched and feeling like others can read or control her mind." (Id.) Ms. Knight recommended weekly individual therapy sessions two to four times a month, family sessions once or twice per month, referral for a psychiatric evaluation, and continued medication monitoring by a clinic psychiatrist. (Id.) During a behavioral health assessment several months later on January 22, 2016, Perla A. stated that she wanted to go to college, was not working, and did not plan to work. (Id. at 270.) Therapist Vivian Chee removed the diagnosis of psychotic disorder, not otherwise specified, due to Perla A. no longer exhibiting or reporting psychotic symptoms. (Id. at 273, 276.)

Three days later, on January 25, 2016, Plaintiff underwent a psychiatric assessment by Olga Caplin, M.D., at the North Central Mental Health Center of San Diego County Mental Health Services. (Id. at 282-90, 299.) Dr. Caplin observed that Plaintiff was a poor historian who frequently stated, "I [cannot] explain." (Id. at 282.) Perla A. reported daily panic attacks, shortness of breath, crying, and paranoia. (Id.) She stated that she did not know how to be around her own family because "I changed, I do not feel myself anymore." (Id.) She also told the physician that she had had a lot of anger in the past but denied having angry outbursts at that time. (Id.) Perla A. had been treated by a psychiatrist about six months before and had taken medication for about three weeks but had stopped due to fear of potential side effects. (Id.) Dr. Caplin updated Perla A.'s diagnoses to "other psych disorder not due to a sub" and anxiety disorder, unspecified, and prescribed Latuda, used to treat bipolar depression. (Id. at 289-90; see also Latuda, https://www.latuda.com/ (last visited Aug. 31, 2020).) On August 31, 2016, Dr. Caplin completed a state disability insurance form in which she explained that Plaintiff was

unable to work because "[d]isorganized thought process, poor focus and concentration prevent the patient from completing the task [sic], high anxiety prevent [sic] the patient from normal social interaction." (Admin. R. 297-98, ECF No. 8.)  The psychiatrist also noted that Perla A. had had an "insufficient response to medications." (Id. at 298.)

Eighteen months later, on July 24, 2017, Plaintiff was admitted to Sharp Mesa Vista Hospital, a mental health facility.  (Id. at 333, 334.)  She was brought in by her parents and had been referred by her psychiatrist due to psychotic behavior.  (Id. at 334.)  Her family reported that she had a history of bipolar disorder, had not taken her medication for the last three months, and had never been compliant with her medication.  (Id.)  Perla A. was noted to have "very disorganized thought process, perseverating on paranoid thoughts regarding not being safe and concern regarding her family that they are not safe." (Id.)  Her father stated that she had made multiple statements regarding suicidal thoughts in the prior couple of weeks.  (Id.)

Through the course of her stay at the hospital, Plaintiff was noted to be psychotic, delusional, disorganized, suspicious, and guarded.  (Id. at 335.)  She was also internally preoccupied, isolative, seclusive, and withdrawn.  (Id. at 336.)  On August 9, 2017, Perla A.'s treating physician, Dr. Syed Jafar, filed a petition for a Riese Hearing because Plaintiff refused to take her prescribed medications on multiple occasions due to a very poor understanding of her illness.  (Id. at 335, 384, 386, 388, 488-89.)[4]  Dr. Jafar attested that Perla A. had a history of schizoaffective disorder, had not been able to work or go to school, and had become "totally dysfunctional."  (Id. at 488.)  Plaintiff was found to not

---

[4] A Riese Hearing is used to determine whether a mental health patient has the capacity to give or withhold consent to the administration of antipsychotic medications.  See S.D. Cal. Super. Ct. Mental Health Ct. R. 8.5.1-.2, http://www.sdcourt.ca.gov/pls/portal/docs/PAGE/SDCOURT/GENERALINFORMATION/LOCALRULESOFCOURT/ROCDIV8/ROCDIV8PORTLET/2020%20DIVISION%20VIII%2C%20CH.%205.PDF (last visited Aug. 31, 2020).

have the capacity to refuse to consent to medication and was ordered to receive her medicine by injection if she continued to refuse to take her medication. (Id. at 336; see also id. at 487 (In the Matter of [Perla A.], Order Regarding Capacity to Consent to or Refuse Antipsychotic Med. (Cal. Super. Ct. Aug. 10, 2017).) She reluctantly agreed to take her medications, including Risperdal and Effexor, to avoid receiving injections. (Id. at 336.) Perla A. continued to be delusional, disorganized, suspicious, guarded, internally preoccupied, and depressed. (Id.)

On August 12, 2017, Dr. Venus C. Paxton, covering for Dr. Jafar, sought to extend Plaintiff's fourteen-day hold because "there is no way she could take care of herself." (Id. at 378; see also id. at 486 (In the Matter of [Perla A.], Cert. Review Hearing Findings and Order (Cal. Super. Ct. Aug. 16, 2017).) Plaintiff's condition eventually stabilized, and she was discharged to her home on August 25, 2017, with instructions to follow up with her psychiatrist. (Id. at 337.) Her diagnoses upon discharge were bipolar disorder, depressed; rule out schizoaffective disorder, bipolar type, depressed; rule out chronic paranoid schizophrenia; and rule out major depressive disorder, chronic recurrent, severe, with psychosis. (Id.) Her medications at the time of her release consisted of Vistaril, Risperdal Consta (administered by injection) every two weeks, Risperdal oral, and Effexor. (Id.)

On September 13, 2017, several weeks after discharge from the hospital, Perla A. received a behavioral health assessment from mental health case management clinician Vernette Christian at the North Central Mental Health Clinic. (Id. at 308, 328.) Plaintiff was noted to be a "former patient of Dr. Caplin," and she last saw the doctor at the clinic on December 9, 2016 (nearly eight months prior to her hospitalization). (Id. at 308.) She was stable on the medications she had been prescribed while hospitalized, including hydroxyzine (Vistaril), Risperidone (Risperdal), and Venlafaxine (Effexor). (Id.) Plaintiff continued to exhibit symptoms of paranoia, anxiety, distrust, panic, and

anhedonia.  (Id.)  She did not have any immediate high-risk factors, denied any suicidal ideation, and stated that she had a supportive family who continually supervised her.  (Id. at 315-16.)  She had sleep issues prior to her hospitalization but was presently sleeping well.  (Id. at 317.)  She was alert, oriented, coherent, cooperative, and showed appropriate affect but exhibited anxious mood and fair judgment.  (Id. at 321.)  Ms. Christian recommended that Plaintiff have ongoing outpatient psychiatric treatment with medication management in order to reduce the frequency and intensity of her symptoms and to prevent another episode of decompensation requiring a higher level of care.  (Id. at 326.)  Plaintiff was also encouraged to attend clinic art groups and community clubhouses for socialization and support; individual supportive therapy was also recommended.  (Id. at 326.)

Plaintiff saw Dr. Caplin on April 12, 2018, for a medication follow up.  (Id. at 330.)  Perla A. reported that she had been doing better since starting an injection form of Invega Sustenna, used to treat schizophrenia and schizoaffective disorder.  (Id.; Invega Sustenna, https://www.invegasustenna.com/ (last visited Aug. 31, 2020).)  Dr. Caplin noted that Plaintiff was a better historian because of an improved thought process, and Perla A. stated that she had decreased anxiety, improved mood, better sleep, decreased paranoia, and no visual hallucinations, but she had had auditory hallucinations for the past two days.  (Admin. R. 330, ECF No. 8.)  The patient's mother said that Perla A. "listens more [and is] more focused."  (Id.)  Plaintiff agreed to continue taking Invega Sustenna and indicated that she wanted supportive therapy but had been unable to find a therapist through her insurance.  (Id.)  During her examination, Plaintiff was cooperative, had poor to fair eye contact, a blunted affect, "better" mood, tangent but more organized thought process, fair insight and judgment, grossly intact cognition, poor focus and concentration, and an average fund of knowledge.  (Id.)  Her response to medication was "fair/compliant," and she denied any side effects.  (Id. at 331.)  Dr. Caplin's plan of care

consisted of follow up with a nurse in four weeks for an injection, healthy diet and exercise, follow up in four weeks or as needed, and further discussion of individual therapy. (Id.)

The following month, on May 7, 2018, Dr. Caplin completed a mental residual functional capacity assessment form on Perla A.'s behalf. (Id. at 497-500.)  The doctor found that Plaintiff had marked limitations in the following abilities:  to understand and remember locations and work-like procedures; to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to travel in unfamiliar places or use public transportation. (Id. at 497-98.)  Dr. Caplin further opined that Perla A. had moderate limitations with the following capacities:  to understand, remember, and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (Id.)  Dr. Caplin explained:

> [Perla A.] attends her appointments and takes medications as prescribed. However[,] she continues to experience severe symptoms and significant limitations in her daily living activities.  Due to poor focus and concentration [Perla A.] is not able to finish simple tasks.  She has tangential thought process and has [difficulty conveying] simple information.  [Perla A.] has poor insight and frequently minimizes symptoms.  She experiences auditory and visual hallucination[s,] paranoia, unstable mood, she has frequent anger outbursts which complicates her relationship with a family, makes it very

8

> challenging to deal with basic social interactions as well as many basic chores.

(Id. at 499.)

## B.   Hearing Testimony

### 1.   Plaintiff's testimony

On May 15, 2018, Perla A. appeared with her attorney at a hearing before ALJ Cole.  (Id. at 30.)  She testified that she lived with her parents and brother.  (Id. at 35.)  She was able to drive but did not have her driver's license, so her father drove her around.  (Id.)  Plaintiff stated that she did not normally take the bus, but she could.  (Id.)  She started twelfth grade but did not graduate from high school.  (Id. at 35-36.)  Plaintiff did not have a job.  (Id. at 36.)  She testified that she had had "really bad experiences" in workplaces and at school and felt "really traumatized with everything that I've gone through."  (Id.)  She had worked full-time as a cashier at T.J. Maxx for three months in 2015 but quit because frustrated customers made her anxious.  (Id. at 36-37.)  She had not looked for any other jobs since then.  (Id. at 37.)  When asked if she was currently in treatment, Perla A., referring to Dr. Caplin, responded, "I think I'm seeing a psychologist."  (Id. at 37-38.)  During an average day, she stayed home with her mother, tried to relax as much as she could, and performed chores including washing dishes, sweeping, cleaning her room, and occasionally cooking.  (Id. at 38.)  Plaintiff testified that she spent time with her family but did not have any friends because past friends had mistreated her.  (Id. at 39-40.)  She stated that she occasionally had trouble concentrating and found it difficult to read books or articles.  (Id. at 40.)  She did not have any problems

with drugs or alcohol.  (Id. at 40-41.)  Plaintiff testified that she received an injection each month for "mental illness that I have."  (Id. at 41.)[5]

### 2. Vocational expert's testimony

Vocational expert ("VE") Lawrence Haney also testified at the hearing.  (Id. at 30.)  Judge Cole asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience with the following work limitations:

> [N]o exertional limitations but is limited to understanding, remembering, [and] carrying out simple, routine, repetitive tasks with a need for standard industry breaks every two hours.  No interaction with the public and no more than occasional work-related, non-personal, non-social interaction with coworkers and supervisors, involving no more than a brief exchange of information or handoff of product.

(Id. at 46.)  The VE responded that the hypothetical individual could perform work at the sedentary level as an election clerk, document preparer, and addresser, and at the light level as a housekeeping cleaner and routing clerk.  (Id. at 46-47.)  Mr. Haney testified that the hypothetical person would be unemployable if she could not work for an hour during the workday in addition to her regularly scheduled breaks.  (Id. at 47.)  He added that missing two days of work a month would make the hypothetical individual unemployable.  (Id. at 47-48.)

### C. ALJ's Decision

On August 23, 2018, the ALJ issued a decision finding that Perla A. was not disabled.  (Id. at 15-25.)  Judge Cole determined that Plaintiff had not engaged in

---

[5] Plaintiff's counsel stated that Plaintiff was receiving Risperidone injections pursuant to a court order issued on August 10, 2017. (Admin. R. 41-42, ECF No. 8.)  Based on the Court's review of the record, this appears to be incorrect.  Although, as discussed above, the Superior Court of California, County of San Diego, issued an order on August 10, 2017, that Plaintiff could be required to accept antipsychotic medication, there is no indication that the order remained in effect after Perla A.'s hospital stay. (Id. at 487.)  Moreover, the record reflects that Plaintiff was receiving injections of Invega Sustenna, not Risperidone, at the time of the administrative hearing.  (Id. at 330.)

substantial gainful activity since November 17, 2015, her alleged onset date. (Id. at 17.) He found that Perla A. had severe impairments: anxiety disorder, bipolar disorder, and schizoaffective disorder. (Id.) He also found that, singly or in combination, Plaintiff did not have impairments that met or medically equaled a listed impairment. (Id. at 17-19.) ALJ Cole further determined that Perla A. had the residual functional capacity ("RFC")[6] to perform the full range of work at all exertional levels but with the following nonexertional limitations: limited to understanding, remembering, and carrying out simple, routine, repetitive tasks, with standard industry work breaks every two hours; no interaction with the general public; and no more than occasional work-related, non-personal, non-social interaction with coworkers and supervisors involving no more than a brief exchange of information or handoff of product. (Id. at 19-23.) The ALJ concluded that Plaintiff could perform the requirements of representative occupations such as election clerk, document preparer, addresser, housekeeping cleaner, and routing clerk. (Id. at 23-24.)

## II.   LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. 42 U.S.C.A. §§ 405(g), 421(d) (West 2011). The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'" Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it

---

[6] Residual functional capacity is "the most you can still do despite your limitations." See 20 C.F.R. § 416.945(a)(1) (2019).

11

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 416.920.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled. 20 C.F.R. § 416.920(b) (2019).  Second, the Commissioner determines whether the

claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 416.920(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 416.920(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 416.920(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 416.920(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

### III.  DISCUSSION

Plaintiff's sole argument is that the ALJ improperly evaluated the opinion of her treating psychiatrist, Dr. Caplin.  (Pl.'s Mem Supp. Mot. Reversal 14-18, ECF No. 13.)  She contends that the ALJ erroneously substituted his opinion of her mental impairment for Dr. Caplin's "uncontroverted opinion."  (Id. at 14.)  The Commissioner refutes that Dr. Caplin's opinion was uncontroverted and contends that it was contradicted by the opinion of state agency doctor Ida Hilliard, M.D., as well as the evidence of record.  (Def.'s Opp'n 9-10, ECF No. 14.)  The Commissioner argues that the ALJ properly accorded Dr. Caplin's opinion little weight and reasonably found that Perla A.'s condition was stable when she was compliant with her medication.  (Id. at 10-14.)  Defendant also contends that ALJ Cole resolved conflicts in the evidence and properly

determined that Plaintiff's residual functional capacity "lay somewhere in between the opinions of Drs. Caplin and Hilliard." (Id. at 14-15.)

In determining whether a claimant is disabled, the ALJ must evaluate all medical opinions he receives. 20 C.F.R. § 416.927(c) (2019).[7] Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." Id. § 416.927(a)(1). Generally, more weight is given to the opinions of treating sources than of nontreating sources. Id. § 416.927(c)(2); see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with" other evidence in the record, the ALJ will give it controlling weight. 20 C.F.R. § 416.927(c)(2). If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ will consider the following factors when deciding the weight to give to any medical opinion: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency with the record as a whole; (5) specialization; and (6) any other relevant factors. Id. § 416.927(c)(1)-(6).

The ALJ is not required to accept the opinion of a treating physician. Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020). If the treating doctor's opinion is not contradicted by another physician's opinion, the ALJ may reject it by articulating "clear and convincing" reasons supported by substantial evidence in the record. Id.; see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). On the other hand, if the treating physician's opinion is contradicted, the ALJ must give "specific and legitimate reasons"

---

[7] The standard for evaluating opinion evidence in supplemental security income claims is set forth in 20 C.F.R. § 416.927 for claims, such as Plaintiff's, filed before March 27, 2017.

to disregard the opinion of the treating physician.  Ford, 950 F.3d at 1154; Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  An ALJ need not accept the opinions of any physician, including a treating physician, that are "unsupported by the record as a whole . . . or by objective medical findings."  Batson, 359 F.3d at 1195 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)); see also Ford, 950 F.3d at 1154; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (holding that "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability[]").

As the Commissioner observes, Dr. Caplin's opinion was contradicted by another medical opinion in the record, that of Dr. Hilliard, the state agency mental consultant, who determined that Plaintiff had a medically determinable impairment of an anxiety-related disorder but did not have severe psychiatric impairments.  (See Admin. R. 57-58, ECF No. 8; 20 C.F.R. § 416.913a(b)(1) (2019) (providing that federal and state agency medical or psychological consultants "are highly qualified and experts in Social Security disability evaluation").)  Dr. Hilliard found that Perla A. had no restrictions on activities of daily living; no difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  (Id. at 58.)  Because Dr. Caplin's opinion was contradicted, the ALJ was required to articulate specific and legitimate reasons to reject the opinion based on substantial evidence in the record.  Ford, 950 F.3d at 1154; Batson, 359 F.3d at 1195.  In providing specific and legitimate reasons to reject a treating physician's opinion, an ALJ should set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Garrison, 759 F.3d at 1012 (quotations and citation omitted).

The ALJ did so here.  ALJ Cole assigned "little weight" to Dr. Caplin's opinions regarding Perla A.'s functional limitations because he found them "inconsistent with the medical record as a whole, including objective signs and findings such as mental status

exam findings[.]" (Admin. R. 22, ECF No. 8.)  The ALJ could properly discredit Dr. Caplin's opinion on this basis.  See Batson, 359 F.3d at 1195.  In his discussion of the medical record, Judge Cole noted that at her April 12, 2018 mental status examination, Plaintiff's cognition was grossly intact and she was cooperative, had normal speech, had less paranoia, had improved and more organized thought process, had better listening, and was more focused.  (Admin. R. 18, ECF No. 8.)  This is supported by the medical record.  (See id. at 330.)  The ALJ also observed that although Perla A. showed "lethargic consciousness and depressed and anxious mood" during a mental status examination on August 18, 2015, her exam was otherwise normal.  (Id. at 20 (citing id. at 241-42, reflecting normal orientation, cooperative behavior, appropriate judgment, normal insight, and no hallucinations or delusions).)  Similarly, on September 13, 2017, although Plaintiff exhibited some symptoms of paranoia, anxiousness, mistrustfulness, panic, and anhedonia, Judge Cole noted that her mental status examination was normal.  (Id. at 20 (citing id. at 321, showing alert consciousness, normal orientation, normal speech, coherent thought process, appropriate affect, and no hallucinations or delusions).)  The ALJ could reasonably conclude that these records conflicted with and undermined Dr. Caplin's opinions.

The treating psychiatrist's restrictive assessment of her patient's functional abilities was also inconsistent with Perla A.'s hearing testimony.  Plaintiff's statements that she was able to drive, wash dishes, sweep, clean her room, and cook simple meals, (see id. at 35, 38-39), did not comport with Dr. Caplin's assessment that Plaintiff was unable to maintain focus and concentration, finish simple tasks, and perform basic chores.  (See id. at 21.)  The ALJ found that this testimony conflicted with Plaintiff's alleged loss of functioning, and he noted that driving "involves some level of concentration and skill retention." (Id.)  ALJ Cole's determination, following his detailed and thorough summary of the facts and conflicting clinical evidence, that Dr. Caplin's opinion was

inconsistent with other medical evidence in the record constitutes a specific and legitimate reason to discount her opinion.  See Batson, 359 F.3d at 1195.

But the ALJ could properly assign limited weight to Dr. Caplin's opinions under the factors set forth in 20 C.F.R. § 416.927.  As noted by the Commissioner, based on the lack of treatment notes in the record, it appears that Perla A. saw Dr. Caplin four times over the course of two and one-half years.  (See Def.'s Opp'n 11, ECF No. 14.)  Plaintiff first saw Dr. Caplin on January 25, 2016, two months after her alleged onset date of November 17, 2015, and then twice more in 2016.  (See Admin. R. 282-90, 297-98 (disability form dated August 31, 2016, indicating that Plaintiff had been seen that day), 308 (reference to Plaintiff last being seen by Dr. Caplin on December 9, 2016), ECF No. 8.)  Indeed, Plaintiff was referred to as a "former patient of Dr. Caplin" when she was seen on September 13, 2017.  (Id. at 308.)  According to the record, Perla A. was seen again by Dr. Caplin on April 12, 2018.  (Id. at 330-31.)  Opinions from treating sources are generally given more weight because these doctors are able to "provide a detailed, longitudinal picture" of the claimant's medical impairments.  20 C.F.R. § 416.927(c)(2)(i).  It was not unreasonable for the ALJ to ascribe Dr. Caplin's opinions reduced weight given the evidence in the record, which showed only a few visits with Dr. Caplin.  See 20 C.F.R. § 416.927(c)(2)(ii) ("Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight we will give to the source's medical opinion.").[8]

The ALJ could also properly question the supportability and consistency of Dr. Caplin's opinions.  Under the regulations, a medical opinion that is "consistent . . . with

---

[8] Plaintiff failed to appear for consultative examinations on May 17, 2016, and October 6, 2016. (Admin. R. 296, 300, ECF No. 8.)  Although the ALJ did not use this as a basis to find Perla A. not disabled, he noted that "failure to appear at a consultative examination without good cause is potentially grounds to find the claimant not disabled[.]"  (Id. at 23 (citing 20 C.F.R. § 416.918).)

17

the record as a whole" and supported by "relevant evidence" such as "medical signs and laboratory findings" is entitled to more weight than an opinion that is not supported or consistent.  See 20 C.F.R. § 416.927(c)(3)-(4).  As discussed above, Dr. Caplin's opinions regarding Plaintiff's functional abilities were not wholly supported by Perla A.'s mental status examinations or her own testimony.  Additionally, Dr. Caplin's May 7, 2018 functional assessment was not entirely consistent with her treatment notes from the month before.  Although Dr. Caplin wrote in her assessment that Plaintiff had poor insight, auditory and visual hallucinations, and unstable mood, (see Admin. R. 499, ECF No. 8), her examination notes reflected that Perla A. had fair insight and judgment, no visual hallucinations, and improved mood with Invega, (see id. at 330).  The treating psychiatrist's statement that Plaintiff had frequent anger outbursts, (see id. at 499), was also not consistent with the record because treatment notes indicated that Perla A. had previously experienced issues with anger but there was no indication this was a continuing problem.  (See id. at 233 (Plaintiff's report that she had difficulty controlling her anger when she was fifteen years old), 282 ("Reports a lot of anger in the past[.]").)  The medical evidence in the record does not reflect ongoing problems with angry outbursts after Plaintiff's alleged onset date and thus does not support Dr. Caplin's opinion.

   Under 20 C.F.R. § 416.927, the ALJ could also consider any factors tending to support or contradict a treating physician's medical opinion.  See 20 C.F.R. § 416.927(c)(6).  In his decision, the ALJ remarked that Plaintiff "has shown stability with medication" and "[c]onversely, when not medication compliant, [her] impairments show regression." (Admin. R. 20-21, ECF No. 8.)  This finding is supported by the record.  Plaintiff's hospitalization in July 2017 appears to have been precipitated by Perla A. not taking her medications for the prior three months.  (Id. at 334.)  She was released from the hospital once her condition had stabilized with medication.  (Id. at 337.)  On May 7,

2018, Dr. Caplin offered a very restrictive assessment of Plaintiff's functional abilities when she had noted only the month before that her patient's condition had improved since taking injectable Invega Sustenna. (Id. at 330-31.) Judge Cole could properly consider that Plaintiff's condition improved with medication and give less weight to Dr. Caplin's functional assessment. See, e.g., Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling . . . ."); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983) (providing that medical evidence establishing a "fair response" to treatment can be considered when evaluating disability).

Plaintiff contends that the ALJ effectively rejected every medical opinion in the record "despite the weight he said he gave them." (Pl.'s Mem Supp. Mot. Reversal 17, ECF No. 13.) But as the Commissioner maintains, ALJ Cole "resolved the conflicts in the evidence and reasonably found that the [residual functional capacity] lay somewhere in between the opinions of Drs. Caplin and Hilliard." (Def.'s Opp'n 15, ECF No. 14.) It was within the ALJ's purview to make this finding. See Thomas, 278 F.3d at 956-57 ("When there is conflicting evidence, the [Commissioner] must determine credibility and resolve the conflict."); Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").

In sum, the ALJ properly reviewed the medical evidence and had sufficiently specific and legitimate reasons supported by substantial evidence in the record to discount Dr. Caplin's opinions.

/ / /
/ / /
/ / /
/ / /

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for reversal and/or remand is **DENIED**.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  August 31, 2020

_____
Hon. Ruben B. Brooks
United States Magistrate Judge